UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

v.                            Case No: 8:18-cv-353-CEH-AEP

MARK W. CIARAVELLA,

      Defendant.

_____/

## OPINION AND ORDER

## I.    INTRODUCTION

Plaintiff, United States of America ("Government"), on behalf of the Department of Education, sued Defendant Mark W. Ciaravella ("Ciaravella") seeking to recover defaulted student loans made to him for attendance at the University of Tulsa law school in the early 1990's. Docs. 1, 24, 37. The loans were guaranteed by Great Lakes Higher Education Corporation and then reinsured by the Department of Education under loan guaranty programs authorized under Title IV-B of the Higher Education Act of 1965, as amended, 20 U.S.C. § 1071, *et seq*. (34 C.F.R. Part 682).

The Government alleges that Ciaravella defaulted on nine promissory notes that have been consolidated into three causes of action,[1] and despite demand for payment,

---

[1] The Complaint alleges three causes of action for: Claim Number 2011A67257 (First Cause of Action); Claim Number 2011A67251 (Second Cause of Action); and Claim Number 2011A67255 (Third Cause of Action). Doc. 1. The First Cause of Action represents seven of the nine promissory notes which were consolidated because of similar interest rates and terms. Each claim has a corresponding Certificate of Indebtedness, respectively Docs. 123-32, 123-33, and 123-34, that sets forth the current amount of the debt owed through a date certain.

Ciaravella has failed and refuses to pay the loans. Doc. 1. Ciaravella answered the complaint admitting the court's jurisdiction and his Florida residency, but otherwise denying the Government's claims. Doc. 7. Ciaravella raised sixteen affirmative defenses, *see id.*, but he primarily relies on his first affirmative defense that the loans have been repaid. *See* Doc. 131. The Government moved to strike affirmative defenses numbered 2, 3, 4, 6, 7, 8, 9, 10, 11, 12, 14, 15, 16, which was granted as unopposed. Docs. 9, 17. The defenses remaining include that Ciaravella discharged the claims by payment, the Government is responsible for administrative costs and fees due to its own actions, and Ciaravella is entitled to a set-off for amounts paid. Doc. 7 at 1–2. On March 13, 2019, the Government moved for summary judgment. Doc. 24. Defendant responded in opposition arguing the loans have been discharged by his payment in 2004 and challenging, among other things, the reliability of the promissory notes because they were illegible and incomplete. Doc. 30. Because disputed questions of material fact existed, the Court denied summary judgment. Doc. 40.

On November 19, 2020, the bench trial of this action began. Ciaravella was the first witness to be called to testify, but the proceedings were adjourned for the day before he completed his testimony.[2] The trial resumed by zoom videoconference[3] on February 1, 2021. The Government finished its direct examination of Ciaravella and also presented testimony from Rubio Canlas ("Canlas"), senior loan analyst and

---

[2] The proceedings had to be continued due to Defendant becoming ill.

[3] Due to the Coronavirus disease, the resulting global pandemic, and the uptick in positivity rates of the virus in the Tampa Bay area in January 2021, the trial was scheduled to be concluded via zoom videoconference. *See* Doc. 117.

records custodian for the United States Department of Education. After the Government rested its case, Ciaravella testified. The Government called Kimberly Hoskins, Ciaravella's ex-wife, as a rebuttal witness. Following the bench trial, the parties submitted proposed findings of fact and conclusions of law. Docs. 129, 131.

Upon due consideration of the testimony, exhibits received into evidence, arguments of counsel at trial, the parties' submissions, and the applicable law, and being fully advised in the premises, the Court issues the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a).

## II.   FEDERAL JURISDICTION

The Court has jurisdiction under Article III, Section 2, U.S. Constitution and 28 U.S.C. § 1345.

## III.   STIPULATED FACTS

The parties stipulated to the following fact, as set forth in their Joint Final Pretrial Statement (Doc. 39):

From 1992 to 1994, Ciaravella attended the University of Tulsa and obtained student loans of various types and amounts.

## IV.   FINDINGS OF FACT

1.    Ciaravella met his wife, Kimberly Hoskins ("Hoskins") in Gainesville, and they were married in 1987. They had their first child in 1989. **Testimony of Mark Ciaravella**; *see also* Doc. 117 at 10–11.[4]

---

[4] The Bench Trial of this action commenced on November 19, 2020. On that date, Ciaravella began his testimony, which was later transcribed. *See* Doc. 117. References to his testimony

2.      Ciaravella graduated from the University of Florida in Gainesville in 1992 and took the LSAT in June 1992.  **Testimony of Mark Ciaravella**; *see also* Doc. 117 at 10–11.

3.      Ciaravella was contacted by the University of Tulsa in the summer of 1992 to attend law school there starting in the fall 1992. Ciaravella and his family moved to Tulsa so he could attend law school there. He was in his early 30's, and his wife was a stay-at-home mom. They had a second child while he was in law school. He graduated early from the University of Tulsa in 1994 because he went straight through school. **Testimony of Mark Ciaravella;** *see also* Doc. 117 at 11–12.

4.      Ciaravella could not afford to go to law school without borrowing money. **Testimony of Mark Ciaravella**, Doc. 117 at 14; *see also* **Testimony of Kimberly Hoskins**.

5.      Obtaining federally guaranteed student loans was a great deal for Ciaravella because the loans had lower interest rates, he did not have to pay on the loans while he was in law school, and there was a grace period following law school that required no payment. Doc. 117 at 15–16.

6.      Ciaravella took out federal guaranteed student loans to cover tuition and expenses for each year he was in law school. Doc. 117 at 16. To get the loans, he had to fill out applications. *Id.* at 31.

---

from that date are made to Doc. 117 followed by the page number. The trial resumed on February 1, 2021 and concluded on that date. Ciaravella's testimony on February 1, 2021 was not transcribed by either party. References to Ciaravella's testimony from February 1, 2021 will be made by his name.

7.      Ciaravella applied for and obtained student loans from Norwest Bank of South Dakota in 1992, 1993, and 1994, which he knew were guaranteed by the United States. Doc. 117 at 16, 18.

8.      Ciaravella had nine federally guaranteed loans. He understood these loans had to be paid back. **Testimony of Mark Ciaravella**; *see also* Doc. 117 at 16–17.

9.      Ciaravella executed nine promissory notes to secure the Federal Guaranteed Student Loans from Norwest Bank South Dakota N.A during the period from 1992 to 1994. Docs. 123-1–123-9;[5] *see also* **Testimony of Rubio Canlas**, Doc. 127 at 8, 14; **Testimony of Mark Ciaravella**, Doc. 117 at 18.

10.     The promissory notes are Stafford Loans in which Ciaravella is identified as the "borrower." Docs. 123-1–123-9. Ciaravella signed each of these promissory notes applying for a federally guaranteed loan. **Testimony of Mark Ciaravella**.

11.     The date Ciaravella signed each promissory note and the amount borrowed under each is as follows:

| | | |
|---|---|---|
| Doc. 123-1 | 7/30/1992 | $7,500.00 |
| Doc. 123-2 | 7/30/1992 | $4,000.00 |
| Doc. 123-3 | 5/4/1993 | $5,897.00 |
| Doc. 123-4 | 7/28/1993 | $7,500.00 |
| Doc. 123-5 | 7/28/1993 | $10,000.00 |
| Doc. 123-6 | 11/30/1993 | $1,000.00 |
| Doc. 123-7 | 4/14/1994 | $7,133.00 |
| Doc. 123-8 | 8/4/1994 | $11,707.00 |
| Doc. 123-9 | 11/10/1994 | $3,129.00[6] |

---

[5] The exhibits entered into evidence at trial are filed in the electronic docket as attachments to Doc. 123. References to the exhibits will be made by the Doc. number in cm/ecf.

[6] Rubio Canlas explained there may be a difference in the original loan amount and what was disbursed because fees would be deducted from the original amount. Doc. 127 at 8, 48. If a

12.    The loans were approved, and the following checks were disbursed made payable to Ciaravella and the University of Tulsa:

| Exhibit # | Amount of Check | Date of Check |
|---|---|---|
| Doc. 123-11 | $3,525.00 | 9/9/1992 |
| Doc. 123-12 | $1,980.00 | 9/9/1992 |
| Doc. 123-13 | $3,525.00 | 12/31/92 |
| Doc. 123-14 | $1,980.00 | 12/31/92 |
| Doc. 123-15 | $2,574.66 | 5/28/1993 |
| Doc. 123-16 | $2,573.72 | 7/6/1993 |
| Doc. 123-17 | $4,700.00 | 9/8/1993 |
| Doc. 123-18 | $3,525.00 | 9/8/1993 |
| Doc. 123-19 | $3,525.00 | 1/3/1994 |
| Doc. 123-20 | $4,700.00 | 1/3/1994 |
| Doc. 123-21 | $470.00 | 2/1/1994 |
| Doc. 123-22 | $470.00 | 3/9/1994 |
| Doc. 123-23 | $3,352.98 | 5/27/1994 |
| Doc. 123-24 | $3,352.04 | 7/5/1994 |
| Doc. 123-25 | $1,071.36 | 8/22/1994 |
| Doc. 123-26 | $4,548.48 | 8/22/1994 |
| Doc. 123-27 | $1,071.36 | 10/19/1994 |
| Doc. 123-28 | $2,047.68 | 11/7/1994 |
| Doc. 123-29 | $1,502.40 | 11/15/1994 |
| Doc. 123-30 | $1,501.44 | 11/16/1994 |

*See also* Doc. 117 at 18–31; Doc. 123-31. The only reason Ciaravella got these checks was because he applied for student loans, which he promised to pay back. Doc. 117 at 31.

---

borrower defaults on a loan, as happened in this case, the bank files a claim with the guaranty agency for the principal amount loaned, along with interest and penalties, and that amount becomes the new principal. *Id.* at 49. If no payments are made to the guaranty agency, the new principal accrues interest and then if the guaranty agency is unable to collect, the principal and interest added together become the new principal assigned to the Department of Education. *Id.* at 50–51.

13.     After graduating from the University of Tulsa in December 1994, Ciaravella and his family returned to Gainesville where he prepared for the bar exam. He took the bar exam in February 1995 and was admitted to the Florida Bar in April 1995. **Testimony of Mark Ciaravella.**

14.     Ciaravella did not begin paying immediately on his student loans after graduation. **Testimony of Mark Ciaravella**.

15.     Ciaravella obtained a job at a two-person firm after being sworn into the Florida Bar. He worked there approximately one and one-half years. **Testimony of Mark Ciaravella**.

16.     On or about September 22, 1999, Ciaravella submitted an unemployment deferment request which suspends payments of federally guaranteed student loans due to unemployment. **Testimony of Mark Ciaravella**; *see also* Doc. 123-35.

17.     On or about October 23, 2001, Ciaravella submitted a forbearance agreement request to Great Lakes Higher Education Guaranty Corporation indicating he is "self/unemployed." He requested forbearance to temporarily suspend the payments. Doc. 123-36. During this time frame, Ciaravella was having financial difficulties. **Testimony of Mark Ciaravella**.

18.     In approximately May 2002, Ciaravella bought a house for $179,900. **Testimony of Mark Ciaravella.**

19.     Ciaravella borrowed money from his mother for the down payment on the house. **Testimony of Mark Ciaravella**; **Testimony of Kimberly Hoskins**.

20.     During this time frame, Ciaravella was paying on other student loans that did not permit forbearance. **Testimony of Mark Ciaravella**.

21.     Ciaravella stopped making any payments on the federally guaranteed loans, and they went into default. **Testimony of Mark Ciaravella**.

22.     Ciaravella does not dispute he signed the promissory notes and that the Government now owns the notes. **Testimony of Mark Ciaravella**.

23.     Ciaravella defaulted on his student loans on September 5, 2002. **Testimony of Rubio Canlas**, Doc. 127 at 11.

24.     Due to Ciaravella's default on the loans, the holder of the notes filed a claim on the loan guarantee, and the guaranty agencies paid the claims. **Testimony of Rubio Canlas**, Doc. 127 at 11.

25.     The guaranty agency paid three insurance claims for $65,778.80 (Doc. 123-32); $8,874.34 (Doc. 123-33); and $20,617.83 (Doc. 123-34).

26.     Ciaravella testified that he and his father had a falling out while he was in high school and they did not speak for 15 years. During that time, Ciaravella graduated high school, went to the University of Florida, went into the Marine Corps, stopped going to college, worked, got married, started a family, went back to college, finished undergraduate school at the University of Florida, and went to law school at the University of Tulsa. **Testimony of Mark Ciaravella**.

27.     Ciaravella testified that at some point when his daughter got older and Hoskins would take her to see her grandfather, Ciaravella chose to make amends with

8

his father. And then his father was diagnosed with lung cancer. **Testimony of Mark Ciaravella**.

28.    Ciaravella testified that at or around the time his father was diagnosed with cancer in 2004, Ciaravella began receiving correspondence from Sallie Mae and Eduserve looking for their loan money. According to Ciaravella, his father wanted to help out with his loans because his father had paid for his siblings to attend college. **Testimony of Mark Ciaravella**.

29.    Ciaravella testified that in 2004 he contacted Eduserve or Sallie Mae to discover the payoff amount for his loans. He testified that he and his father went to the Kinko's on Fletcher and Dale Mabry to receive a facsimile with the payoff amount. Ciaravella further testified that his father wrote a personal check, not a cashier's check, for the amount due. Ciaravella also testified there were three checks. Ciaravella testified he does not remember the total pay-off amount. **Testimony of Mark Ciaravella**.

30.    Ciaravella testified that he personally mailed the check. **Testimony of Mark Ciaravella**.

31. Ciaravella's father died August 27, 2004. **Testimony of Mark Ciaravella**; **Testimony of Kimberly Hoskins**.

32.    Although Ciaravella testified that he paid off his student loans by personally mailing a check or checks given to him by his father shortly before his father

died, Ciaravella told no one that his father paid off his student loans. He did not tell his mother, Hoskins, or his siblings. **Testimony of Mark Ciaravella**.

33.    Ciaravella never told Hoskins that his father paid off his student loans. **Testimony of Kimberly Hoskins**.

34.    After his father died, Ciaravella inherited money from his father, most of which he used to repay his mother for the money he borrowed from her for the down payment on his house. **Testimony of Kimberly Hoskins**.

35.    Ciaravella and Hoskins were married from 1987 until 2009. **Testimony of Kimberly Hoskins**.

36.    Ciaravella testified that he received no communication regarding the loans from 2004 through 2011. **Testimony of Mark Ciaravella**.

37.    In 2011, Ciaravella received three letters saying his student loans had not been paid. At that time, he did not go to his father's bank to try to get records or canceled checks to prove the loans had been paid. **Testimony of Mark Ciaravella**.

38.    The United States Department of Justice sent three letters to Ciaravella in June 2011 regarding the debts owed by him on the student loans.[7] Docs. 123-37, 123-38, 123-39.

39.    Ciaravella testified he does not remember receiving the letters from the U.S. Department of Justice, but he did recall receiving three letters in 2011 from attorney Steven Davis about the student loans owed. **Testimony of Mark Ciaravella**.

---

[7] These exhibits were admitted for the limited purpose of establishing notice to Ciaravella. Doc. 127 at 28.

40.     Ciaravella responded to attorney Davis in a letter dated December 1, 2011 disputing the validity of this claim. The letter indicated that Ciaravella did not understand why there were three accounts with the United States of America. He did not understand what these amounts represented. He asked Davis to provide the documentation described in his letter.[8] **Testimony of Mark Ciaravella**.

41.     Ciaravella testified that he received no communication regarding the loans after receiving the letters in 2011 until when the lawsuit was filed in 2018. **Testimony of Mark Ciaravella**.

42.     Ciaravella testified that after the lawsuit was filed he tried to get copies of the canceled checks from his father's bank, but he was unable because his father's bank no longer existed. **Testimony of Mark Ciaravella**.

43.     The first time Ciaravella told anyone that his student loans had been re-paid by his father was when he filed an affidavit in this case.[9] **Testimony of Mark Ciaravella**.

44.     Rubio Canlas, a senior loan analyst with Federal Student Aid and the Department of Education since July 2010, testified at trial. **Testimony of Rubio Canlas**, Doc. 127 at 4–74.

---

[8] The December 1, 2011 letter was not entered into evidence, but Ciaravella discussed it during his testimony. He testified that he produced the letter to the Government in July 2018 pursuant to discovery requests.
[9] Ciaravella filed an affidavit in opposition to the Government's motion for summary judgment on March 28, 2019. Neither the affidavit (Doc. 27-1) nor amended affidavit (Doc. 28-1) was admitted as an exhibit at trial, although Ciaravella testified as to some of the information that was contained in his affidavit.

45.     Canlas is a records custodian for the Department of Education. **Testimony of Rubio Canlas**, Doc. 127 at 5.

46.     In the Federal Family Education Loan Program, also referred to as the guaranteed student loan program, banks and other financial institutions originate loans for students applying to college. When a student applies for financial aid, the bank or financial institution provides a loan, but if a default occurs, the bank files a claim with a guaranty agency. The guaranty agency pays the claim to the bank and then attempts to collect the debt from the student borrower. If the guaranty agency cannot collect from the student borrower, the loan is assigned to the Department of Education for collection. **Testimony of Rubio Canlas**, Doc. 127 at 5.

47.     Federal Family Education loans are the type of loans that Ciaravella had. **Testimony of Rubio Canlas**, Doc. 127 at 6.

48.     Through his review of promissory notes, copies of disbursement checks, and reviewing the Department of Education database, Canlas determined Ciaravella took out the loans at issue in this case. **Testimony of Rubio Canlas**, Doc. 127 at 6.

49.     Certificates of Indebtedness are the Department of Education's way of certifying the debt as of a particular date. **Testimony of Rubio Canlas**, Doc. 127 at 11.

50.     Canlas prepared and signed three Certificates of Indebtedness. The reason for three separate Certificates was due to slight differences in the interest rates charged for the various loans. Loans with the same interest rates were grouped

together. **Testimony of Rubio Canlas**, Doc. 127 at 11–12; *see also* Docs. 123-32, 123,33, 123-34.

51.     The debt on each Certificate of Indebtedness was certified as of February 24, 2020. Because of the pandemic, effective March 15, 2020, no interest is being charged on any federal student loans held by the Department of Education. Ciaravella may owe more interest for the period from February 24, 2020 through March 15, 2020, but the Government is not seeking to collect it. **Testimony of Rubio Canlas**, Doc. 127 at 15–16.

52.     To create the Certificates of Indebtedness, Canlas used a form template in which he plugs in information obtained from the Debt Management Collection System and the Department of Education database records. **Testimony of Rubio Canlas**, Doc. 127 at 48.

53.     The National Student Loan Data System is the database used primarily by financial aid officers in the schools. Lenders, servicers, and guaranty agencies report information into that database. **Testimony of Rubio Canlas**, *id.* at 57.

54.     Some payments were made on the loans by Ciaravella in the early 1990s. Ciaravella received a credit for making $1,255 in payments before the guaranty agency took over. **Testimony of Rubio Canlas**, Doc. 127 at 24; *see also* Doc. 123-32.

55.     There are several entities that could have accepted payments for the loans at issue including the original lender Norwest Bank, any bank or entity Norwest assigned the loans to, the guaranty agencies Norstar or Great Lakes, or any collection

agency hired by the guaranty agency or the Department of Education. **Testimony of Rubio Canlas**, Doc. 127 at 54–56.

56.     The promissory notes labeled exhibits 1, 3, 4, 6, 7, 8, and 9 representing the seven loans made on July 30, 1992; May 4, 1993; July 28, 1993; November 30, 1993; April 14, 1994, August 4, 1994; and November 10, 1994 have the same terms and interest rate. **Testimony of Rubio Canlas**, Doc. 127 at 12–13. These seven loans were grouped together for purposes of the first Certificate of Indebtedness. Doc. 123-32. After Ciaravella defaulted and the guaranty agency paid the claims, the holder of the note was paid $65,778.80. *Id.*; *see also* Doc. 127 at 13–15.

57.     Since the assignment of the loans to the Government, Ciaravella has not made any payments toward these loans. **Testimony of Rubio Canlas**, Doc. 127 at 15.

58.     As of February 24, 2020, the debt owed on these seven loans, as reflected in the first Certificate of Indebtedness is a principal amount of $64,913.80 and an interest amount of $49,423.35, for a total debt as of February 24, 2020 of $114,337.15. **Testimony of Rubio Canlas**, Doc. 127 at 15; *see also* Doc. 123-32.

59.     The Department of Education has tried to collect on the debt reflected in the first Certificate of Indebtedness but has been unsuccessful. **Testimony of Rubio Canlas**, Doc. 127 at 16. The first Certificate of Indebtedness was moved into evidence without objection. *Id.*

60.     The second Certificate of Indebtedness concerns a $4,000 loan originated July 30, 1992. **Testimony of Rubio Canlas**, Doc. 127 at 17; *see also* Doc. 123-33.

Ciaravella paid nothing on this loan and defaulted on the loan as of September 5, 2002. Doc. 127 at 17. The guaranty agency paid $8,874.34 to the lender for this loan. *Id.* at 18. The guaranty agency attempted to collect the debt but could not and assigned it to the Department of Education on September 18, 2009. *Id.* The Department of Education is the holder of this note and has tried to collect the debt from Ciaravella, but has been unsuccessful. *Id.*

61.     The current amount owed on the second Certificate of Indebtedness is a principal amount of $8,874.34 and an interest amount of $7,344.40, for a total debt as of February 24, 2020 of $16,218.74. **Testimony of Rubio Canlas**, Doc. 127 at 19; Doc. 123-33. The second Certificate of Indebtedness was moved into evidence without objection. *Id.* at 19–20.

62.     The third Certificate of Indebtedness concerns a $10,000 loan originated on July 28, 1993. **Testimony of Rubio Canlas**, Doc. 127 at 20; *see also* Doc. 123-34. Ciaravella paid nothing toward this loan, and he defaulted on the loan on September 5, 2002. Doc. 127 at 21. The bank demanded payment, but Ciaravella did not pay. *Id.* Thereafter, the guaranty agency repaid the bank. *Id.* The guaranty agency attempted to collect on the debt, they could not do so, and the loan was assigned to the Department of Education who paid the guaranty agency $20,617.83. *Id.* The Department of Education has been the holder of the note since September 2009 and still holds the note. *Id.* at 21–22. The Department of Education has tried to collect on the debt but has been unable to. *Id.* at 22.

63.    The total debt on the third Certificate of Indebtedness is a principal amount of $20,617.83 and an interest amount of $16,536.23 for a total debt as of February 24, 2020 of $37,154.06. **Testimony of Rubio Canlas**, Doc. 127 at 22; *see also* Doc. 123-34. The third Certificate of Indebtedness was moved into evidence without objection. Doc. 127 at 22–23.

## V.    CONCLUSIONS OF LAW

### A.    Indebtedness for Default on Student Loan

To recover on a promissory note, the United States must establish three elements: (1) Ciaravella signed a promissory note for a student loan; (2) the United States is the present owner or holder of the note; and 3) that note is in default. *United States v. Carter*, 506 F. App'x 853, 858 (11th Cir. 2013) (citing *United States v. Lawrence*, 276 F.3d 193, 197 (5th Cir. 2001)); *see also United States v. Romero*, 562 F. App'x 943, 948 (11th Cir. 2014). "The Department may establish the *prima facie* elements by producing the promissory note and certificate of indebtedness signed under penalty of perjury." *United States v. Hennigan*, No. 6:13-cv-1609-Orl-31DAB, 2015 WL 2084729, at *4 (M.D. Fla. Apr. 30, 2015), at *7 (citing *Guillermety v. Sec'y of Educ. of the United States*, 341 F. Supp. 2d 682, 688 (E.D. Mich. 2003)).

The government is not required "to produce the original promissory note[s] in order to recover on the note[s] because . . . the note[s] [are] not [] negotiable instrument[s] subject to Florida's commercial paper law." *Carter*, 506 F. App'x at 858. "A promissory note encompassing a promise to repay a student loan that is guaranteed

by the government is not freely negotiable, but rather it can only be assigned to eligible lenders." *Id.* (citing 34 C.F.R. § 682.508(c)).

At trial, the Government entered the nine promissory notes and three Certificates of Indebtedness into evidence, without objection.[10] Docs. 123-1–123-9; Docs. 123-32–123-34. Ciaravella testified he signed the nine promissory notes to obtain the federally guaranteed loans. He further acknowledged that the United States is the owner of the notes. Thus, the first two elements have been met as undisputed. Further, the evidence at trial showed that Ciaravella defaulted on the loans on September 5, 2002.

Ciaravella argues in his Proposed Findings of Fact and Conclusions of Law that the Certificates of Indebtedness are unreliable and should be disregarded by the Court. Specifically, he cites to Canlas' testimony that the information in the databases is entered by lenders, servicers, or guaranty agencies, and thus he argues that the information is only as good as the individual assigned to report the information. As an initial matter, he offers no testimony or evidence that information was entered incorrectly into the database. But, even more critically, the Certificates of Indebtedness were entered into evidence, without objection, and thus they may properly be considered by the Court.

---

[10] Ciaravella initially objected to admission into evidence of the second page of the promissory notes. In discovery, the Government had only produced the first of the two pages of each promissory note. At trial, Canlas testified that he contacted all of the lenders and guaranty agencies in order to get a complete copy of each promissory note. Doc. 127 at 6–7. Ciaravella withdrew his objection, and the nine promissory notes were admitted into evidence. *Id.* at 64–65.

Ciaravella further argues that the Certificates of Indebtedness were created for purposes of litigation, are not business records, and are double hearsay. Doc. 131. Specifically, he argues that the Certificates are inadmissible hearsay because they do not qualify under the business records exception of Rule 803(b)(6). *Id.* at 8–11. But no such objection was raised at trial and thus the objection is deemed waived. The Certificates of Indebtedness were admitted into evidence without objection. *See* Doc. 127 at 16, 20, 23.

The Certificates of Indebtedness establish that the Government is the present holder of the notes, the notes are in default, and the amounts of the debt owed by Ciaravella. The Government has established a *prima facie* case of Ciaravella's default on the student loans raised in the Government's three causes of action.

## B.    Affirmative Defenses

 "After the plaintiff establishes its *prima facie* case, the burden shifts to the defendant to 'produce specific and concrete evidence of the nonexistence, payment, or discharge of the debt.'" *United States v. Luznar*, No. 6:17-cv-1744-Orl-18DCI, 2019 WL 1468517, at *2 (M.D. Fla. Feb. 15, 2019) (quoting *Hennigan*, 2015 WL 2084729, at *9); see also *United States v. Lindahl*, No. 8:16-CV-1614-T-27JSS, 2017 WL 1017839, at *2 (M.D. Fla. Mar. 15, 2017) ("Once the United States establishes a *prima facie* case, the burden shifts to Lindahl to show whether the government had properly credited his past payments.") (citing *Carter*, 506 F. App'x at 859). Ciaravella does not dispute

he applied for the loans or that the Government is now the holder of the notes. Rather, Ciaravella claims the debt has been discharged by payment.

Ciaravella contends that the student loan debt has been discharged because he paid the loans in full in 2004 with money he received from his father just before his father's death. However, it is insufficient "for a defendant to merely allege non-liability; rather, the defendant must produce specific and concrete evidence of the nonexistence, payment, or discharge of the debt." *United States v. Foreman*, No. 6:14-cv-1965-Orl-40DAB, 2016 WL 1402885, at *5 (M.D. Fla. Mar. 16, 2016) (citations omitted). The "types of documents found to be acceptable as evidence of payment" include "[c]ancelled checks, bank statements, and tax records." *Id.* At trial, Ciaravella proffered no specific, concrete evidence to support his claim that his federal student loan debt has been discharged.

According to Ciaravella, his father wanted to help him out by paying off his student loans before he died. Ciaravella claims he and his father went to a Kinko's near his father's house where they received a facsimile with the pay-off information and the address to send payment. Ciaravella testified his father wrote a personal check or checks, not a cashier's check, and that Ciaravella personally mailed the check or checks to the address listed on the facsimile.[11] Ciaravella did not make a copy of the checks, he did not keep a copy of the facsimile, and he does not have proof that he sent the payment by certified mail. Ciaravella proffered no concrete evidence by way of

---

[11] Ciaravella's testimony is inconsistent as to whether his father wrote one check or more than one check.

canceled check, bank statement, affidavit from any lender or testimony of any bank representative that money had been sent and received to pay off his loans. And although payment in full of his outstanding student loans would have relieved tremendous financial strain that Ciaravella was experiencing at the time, he nevertheless told no one that his father paid his student loans for him, not even his then-wife, until after this lawsuit was filed.

When he received collection letters from an attorney in 2011, Ciaravella did not try to locate his father's bank records to obtain proof of payment. Moreover, in response to the collection letters, Ciaravella did not categorially deny he owed the money or emphatically declare that the loans had been repaid. Instead, he responded by disputing the validity of the claim, and indicating that he did not understand why there are three accounts with the United States of America, and he did not understand what the amounts represent. These comments seem to contradict the actions of a person who believes the debts have been paid in full.

After the lawsuit was filed, Ciaravella claims he tried to get the banking records from his father's bank, but they were unavailable because the bank was no longer in business.  Ciaravella called no witness or records custodian from the successor bank to testify as to what happened to his father's bank or the records of that bank.

Ciaravella argues that a number of entities were authorized to accept payments of the subject debt, the implication being that any of several entities could have received the payment. But again, he proffers no evidence or testimony from any of the guaranty agencies or original lending bank.  The records custodian for the Department

of Education testified that no payments were received from Ciaravella on the loans after they were in default. Ciaravella presents no specific evidence to refute this testimony or the Certificates of Indebtedness.

Ciaravella also testified that very little collection activity occurred regarding these loans. Other than the three letters he received in 2011, Ciaravella claims there was no attempt to collect the debt between 2004 and 2011 and again between 2011 and the filing of the lawsuit in 2018. At trial, Canlas testified that the guaranty agency and the Government attempted to collect on the loans but were unsuccessful. Any claimed delay between collection efforts will not defeat the Government's claim. There is no statute of limitations to bar the United States from suing for repayment of a defaulted student loan. *See* 20 U.S.C. § 1091a; *United States v. Glockson*, 998 F.2d 896, 897 (11th Cir. 1993) (Congress eliminated all statutes of limitations for lawsuits by the United States to collect defaulted student loans, which applied retroactively and revived previously barred actions). Similarly, laches is not a defense to an action brought by the United States to enforce its rights. *See Herman v. South Carolina Nat'l Bank*, 140 F.3d 1413, 1427 (11th Cir. 1998) (citing *United States v. Summerlin*, 310 U.S. 414, 416 (1940)).

Another affirmative defense raised by Ciaravella in his pleadings is that the Government is responsible for administrative costs, post judgment interest and attorney's fees, but he proffered no evidence at trial to support this defense. Last, regarding Ciaravella's claim that he is entitled to a set-off for payments made by him to the Government or its agents, the only evidence at trial of payments was a credit he

already received for the payments totaling $1,255 made before the loans were in default. *See* Doc. 123-32. This credit was referenced and accounted for in the first Certificate of Indebtedness. *Id.* Ciaravella did not proffer evidence of any other payments made. Because he offered no evidence at trial regarding his affirmative defense of set-off, this defense fails.

## VI.   CONCLUSION

For the reasons stated above, it is hereby **ORDERED** and **ADJUDGED** as follows:

1.     Plaintiff, United States of America, has established by the greater weight of the evidence the elements of Plaintiff's first, second, and third causes of action as to Defendant Mark Ciaravella's indebtedness for the student loans as described in the first Certificate of Indebtedness (Doc. 123-32), second Certificate of Indebtedness (Doc. 123-33), and third Certificate of Indebtedness (Doc. 123-34).

2.     Defendant, Mark Ciaravella, did not present sufficient evidence to establish any of his Affirmative Defenses.

3.     The Court finds in favor of Plaintiff, the United States of America, as to all three causes of action. Plaintiff, the United States of America, shall recover from Defendant Mark W. Ciaravella, as to the first cause of action the amount of $114,337.15; as to the second cause of action the amount of $16,218.74; as to the third cause of action the amount of $37,154.06; for a total amount of $167,709.95 for actual damages.

4.      The Clerk is directed to enter judgment in favor of Plaintiff, United States of America, in the total amount of $167,709.95, with interest as provided by law, and against Defendant, Mark Ciaravella.  The Clerk is further directed to close this case.

**DONE AND ORDERED** in Tampa, Florida on March 12, 2021.

Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record and Unrepresented Parties, if any